## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:

START MAN FURNITURE, LLC, et al.[1]

Chapter 7
Case No. 20-10553 (CTG)
Jointly Administered

---

TODD STEWART and JENNIFER
SAWLE, on behalf of themselves and all
others similarly situated,

                Appellants,

v.


ALFRED T. GIULIANO, chapter 7 trustee
for Debtors Start Man Furniture, LLC, et
al.,

                Appellee.

Civil Action No. 22-cv-450 (CFC)

Bankruptcy Case No. 20-10553 (CTG)
Bankruptcy Adv. Pro. No. 20-50548
(CTG)
Bankruptcy BAP No. 22-00030

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Start Man Furniture, LLC (f/k/a Art Van Furniture, LLC) (9205); SVF Holding Company, Inc. (f/k/a AVF Holding Company, Inc.) (0291); SVCE, LLC (f/k/a AVCE, LLC) (2509); StartVF Holdings I, LLC (f/k/a AVF Holdings I, LLC) (2537); StartVF Holdings II, LLC (f/k/a AVF Holdings II, LLC) (7472); SVF Parent, LLC (f/k/a AVF Parent, LLC) (3451); Levin Parent, LLC (8052); Start Man Furniture of Canada, LLC (f/k/a Art Van Furniture of Canada, LLC) (9491); SV Sleep Franchising, LLC (f/k/a AV Pure Sleep Franchising, LLC) (8968); SVF Franchising, LLC (f/k/a AVF Franchising, LLC) (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

|  |  |
|---|---|
| ALFRED T. GIULIANO, chapter 7 trustee For Debtors Start Man Furniture, LLC, et al., | Civil Action No. 22-cv-489 (CFC) |
| Appellant, | Bankruptcy Case No. 20-10553 (CTG) Bankruptcy Adv. Pro. No. 20-50548 (CTG) Bankruptcy BAP No. 22-00032 |
| v. | |
| TODD STEWART and JENNIFER SAWLE,  on behalf of themselves and all others similarly situated, | |
| Appellees. | |

## APPELLEE TRUSTEE'S ANSWERING BRIEF

PACHULSKI STANG ZIEHL & JONES LLP
Bradford J. Sandler (Bar No. 4142)
Beth E. Levine (admitted *pro hac vice*)
Colin R. Robinson (Bar No. 5524)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:  bsandler@pszjlaw.com
          crobinson@pszjlaw.com
          pkeane@pszjlaw.com

*Counsel to Alfred T. Giuliano, Chapter 7 Trustee*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Each of the Debtors listed below* is wholly directly or indirectly owned by SVF Holding Company, Inc. (f/k/a AVF Holding Company, Inc.) ("<u>Holding</u>").  Holding has no corporate parent, and there is no publicly held corporation that owns 10% or more of its stock.

*<u>Applicable Debtors</u>:  Start Man Furniture, LLC (f/k/a Art Van Furniture, LLC); SVCE, LLC (f/k/a AVCE, LLC); StartVF Holdings I, LLC (f/k/a AVF Holdings I, LLC); StartVF Holdings II, LLC (f/k/a AVF Holdings II, LLC); SVF Parent, LLC (f/k/a AVF Parent, LLC); Levin Parent, LLC; Start Man Furniture of Canada, LLC (f/k/a Art Van Furniture of Canada, LLC); SV Sleep Franchising, LLC (f/k/a AV Pure Sleep Franchising, LLC); SVF Franchising, LLC (f/k/a AVF Franchising, LLC); LF Trucking, Inc.; Sam Levin, Inc.; and Comfort Mattress LLC.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT ...................................................................1

II.   STANDARD OF REVIEW ........................................................................6

III.  STATEMENT OF THE CASE ..................................................................7

     A.    General Background.........................................................................7

     B.    The Planned Liquidation Process......................................................8

     C.    The Filing of the Chapter 11 Cases and the Rapid Escalation of
           the Pandemic Resulting in the Layoff ...............................................12

     D.    The Adversary Proceeding and the Bankruptcy Court Ruling ...........18

III.  SUMMARY OF ARGUMENT..................................................................19

IV.  ARGUMENT.........................................................................................20

     A.    The Unprecedented COVID-19 Pandemic and the Attendant
           Immediate Governmental Shutdown of Non-Essential
           Businesses Including the Debtors' Stores and the Mandated
           "Stay at Home" Orders Were "Not Reasonably Foreseeable"
           and Thus, the UBC Defense Applies and the Debtors Were Not
           Subject to the 60-Day Notice Provisions of the WARN Act..............20

     B.    The Bankruptcy Court Did Not Err in Finding the COVID-19
           Pandemic Directly Caused the Layoff for Purposes of the UBC
           Exception and Natural Disaster Exception. ........................................25

     C.    The Debtors Were Not Required to Provide Any Notice
           Because the Layoff Was Due to the COVID-19 Pandemic -- a
           "Natural Disaster" For Purposes of the WARN Act..........................28

          1.    The Pandemic Is a Natural Disaster.........................................28

          2.    The But-For Causation Standard Applies to the Natural
              Disaster Exception ..................................................................34

     D.    The Bankruptcy Court Did Not Err in Denying Appellants Any
           Further Discovery in the Adversary Proceeding.................................38

V.   CONCLUSION......................................................................................40

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*American Flint Glass Workers Union v. Anchor Resolution Corp.*,
   197 F.3d 76 (3d Cir. 1999) ................................................................6

*Czyzewksi v. Jevic Transp. Inc. (In re Jevic Holding Corp.)*,
   496 B.R. 151, 161 (Bankr. D. Del. 2013) .........................................23

*Farrell v. Planters Lifesavers Co.*,
   206 F.3d 271 (3d Cir. 2000) ..............................................................6

*Fields v. Thompson Printing Co., Inc.*,
   363 F.3d 259 (3d Cir. 2004) ..............................................................7

*Hanover Potato Products, Inc. v. Shalala*,
   989 F.2d 123 (3d Cir. 1993) ..............................................................6

*Hotel Employees & Restaurant Employees International Union Local 54 v.*
   *Elsinore Shore Associates*,
   173 F.3d 175 (3d Cir. 1999) ............................................................22

*In re AE Liquidation, Inc.*,
   522 B.R. 62 (Bankr. D. Del. 2014).................................................22

*In re Mushroom Transp. Co., Inc.*,
   382 F.3d 325 (3d Cir. 2004) ..............................................................6

*JN Contemporary Art, LLC v. Phillips Auctioneers LLC*,
   2020 U.S. Dist. LEXIS 237085 (S.D.N.Y. Dec. 16. 2020)................32

*Marco v. Accent Pub. Co.*,
   969 F.2d 1547 (3d Cir. 1992) ............................................................6

*Shelton v. Lemons*,
   486 Fed.Appx. 395 (5th Cir. 2012) ..................................................40

*Simpson v. Panhandle S. Plains Fair Ass'n*,
   2001 U.S. Dist. LEXIS 15080, (N.D. Tex. Aug. 9, 2001) ..................40

*Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.)*,
   866 F.3d 515, 528 (3d Cir. 2017) ....................................................22

<u>**OTHER AUTHORITIES**</u>

20 C.F.R. § 639.9 ..............................................................................17
20 C.F.R. § 639.9(c)..........................................................................23
29 U.S.C. § 2101 ........................................................... 3, 7, 13, 15
29 U.S.C. § 2101(a)(1).......................................................................17
29 U.S.C. § 2102 ..............................................................................17

29 U.S.C. § 2102(a) ............................................................................................17
29 U.S.C. § 2102(b)(2)(A) ............................................................................ 15, 20
29 U.S.C. § 2102(b)(2)(B) ....................................................................... 3, 15, 23
29 U.S.C. § 2102 ................................................................................................17
29 U.S.C.§ 2102(b)(2)(A) ...................................................................................3
29 U.S.C. § 2104 ................................................................................................17
Fed. R. Civ. P. 56(a)..........................................................................................16
Fed.R.Evid. 201 ................................................................................................10
Fed.R.Evid. 201(b)............................................................................................10

DOCS_LA:344272.10 05233/003

Alfred T. Giuliano, Chapter 7 Trustee (the "Trustee") to Art Van Furniture, LLC ("AVF"), Sam Levin, Inc. ("SLI") and related debtors (collectively, the "Debtors" or "Art Van") submits this Answering Brief to the Opening Brief (the "Opening Brief") submitted by the above-captioned Appellants ("Appellants" or "Plaintiffs"), in Appellants' appeal from the final order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), set forth in its *Opinion* and *Order* filed on March 21, 2022 [Adv. D.I. 63 & 64] (Appendix A001693-A001721 and A001722, respectively) (the "Opinion" or "Order").[1]

## I.   PRELIMINARY STATEMENT

Notwithstanding Appellants' generalized claims of need for more discovery, their irrelevant distractions (including unsubstantiated claims that the Debtors' board might have had some nefarious goal or was incompetent regarding the Layoff (defined below)) set forth in dozens of pages of the Opening Brief, the necessary judicial analysis in this appeal is straightforward.

Importantly, the relevant material facts are not in dispute, as found by the Bankruptcy Court.  On March 5, 2020 -- after months of negotiations with secured

---

[1] All citations herein to "Adv. D.I. __" refer to the adversary proceeding docket in Adversary Number 20-50548 (CSS).  All citations to "Bankr. D.I. __" refer to the Debtors' lead Chapter 11 Case, Case No. 20-10553 (CSS).  The Opinion is reported at *Stewart v. Art Van Furniture, LLC (In re Art Van Furniture, LLC),* 638 B.R. 523 (Bankr. D. Del. 2022), and all references to the Opinion will be made herein to the reported case.

lenders and attempts to locate alternative financing, the Debtors, who operated retail furniture stores for over half a century, publicly announced that they were going out of business and began implementing a planned liquidation that involved: (i) conducting going-out-of-business sales in certain stores (the "GOB Sales"); (ii) consummating a sale of certain stores and related assets to a third party and; (iii) filing chapter 11 bankruptcy proceedings to facilitate the foregoing orderly liquidation process.  As part of this liquidation process, also on March 5, 2020, the Debtors issued a notice pursuant to the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq*. (the "WARN Act"), advising "affected employees" (including Appellants) who worked in or reported to seven facilities in Michigan, two facilities in Illinois and one in Pennsylvania (the "WARN Locations") that their last day of employment would be on or about May 5, 2020. Three days later, on March 8, 2020, the Debtors filed petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

Over the next 11 days in March 2020, the unprecedented pandemic stemming from the COVID-19 virus made the Debtors' planned liquidation impossible.  The extraordinary adverse effects during this period (social, economic, and business) caused by the COVID-19 pandemic, confronting the Debtors and many other

2

businesses, are a matter of public record.[2]  Among other signs of the escalation of

the pandemic, on March 13, 2020, then-President Donald Trump declared a national

emergency,[3] and less than a week later, on March 19, 2020, Pennsylvania became

the first of the four states in which the Debtors' major retail and fulfillment

operations were located to issue a "stay at home" or "shelter in place" type order.

Similar orders soon followed in Michigan, Ohio and Illinois, all of which also were

in lock-down by March 23, 2020.[4]

---

[2] *See Declaration of Bradford Sandler* [Adv. D.I. 46] (Appendix A000435-A001427) (the "Sandler Declaration"), Exhibits L to S attached thereto (Appendix AB_00046-AB_0001038).

[3] *See* Sandler Declaration, Exhibit L attached thereto (Appendix AB_000817 – AB_000819).

[4] See Sandler Declaration, Exhibit P attached thereto (Pennsylvania: Gov. Tom Wolf, Executive Order, dated March 19, 2020, available at https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf (Appendix AB_00080-AB_000832); Exhibit Q (Michigan: Gov. Gretchen Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90487-522625--,00.html (Appendix AB_000833-AB _000836); Exhibit R (Ohio: Dir. of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020, available at https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments /1407840/Stay%20Home%20Order.pdf (Appendix AB_000837-AB_000849); Exhibit S (Illinois: Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19 Executive Order No. 8), dated March 20, 2020, available at https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf (Appendix AB_000850-AB_000861).

DOCS_LA:344272.10 05233/003

It was against this undisputed factual backdrop that on March 19, 2020, with no ability to fund operations during a mandated closure of non-essential businesses of then-undetermined length, that the Debtors made the decision to discontinue the GOB Sales and immediately end store operations and issued a revised WARN Act notice to Appellants advising them that their employment would end on or about March 20, 2020 (the "Layoff").[5]

As the Bankruptcy Court found, COVID-19 caused the March 20, 2020 Layoff.  Accordingly, the Bankruptcy Court granted summary judgment in favor of the Trustee, concluding that the estates were not liable to Appellants for violations of the WARN Act pursuant to (i) 29 U.S.C. § 2102(b)(2)(A) (the "UBC Exception") and (ii) 29 U.S.C. § 2102(b)(2)(B) (the "Natural Disaster Exception"). For the reasons set forth herein, this Court should affirm.

Specifically, notwithstanding Appellants' claim that the Bankruptcy Court erred by not allowing more discovery in the Adversary Proceeding, as discussed herein, all relevant, material facts are undisputed and the necessary judicial analysis in the instant appeal is straightforward.   The WARN Act's relevant statutory

---

[5] Note that the Trustee contends that the Debtors had no obligation to issue this March 19, 2020 notice as they were not "employers" under the WARN Act on that date.   They were instead "liquidating fiduciaries" which are not subject to the WARN Act's notice requirements. *See* Cross-Appellants' Opening Brief [Docket No. 9], Civil Action No. 22-cv-489 (CFC) (AB_0001362-AB_0001391).

language is plain and broad and should be reasonably and flexibly read and applied, with common sense and logic.[6]  The Bankruptcy Court did not abuse its discretion in ruling that no further evidence was needed to grant summary judgment to the Trustee on the Natural Disaster Exception and the UBC Exception to the WARN Act.

For the purposes of the WARN Act, as a matter of policy, and based on the statutory text and well-reasoned case law, there should be no liability because the Layoff was caused by the COVID-19 pandemic – a natural disaster as well as an unforeseeable business circumstance.  A government-required shutdown of non-essential businesses (as ordered in the relevant states during the time of the Layoff) is a shutdown, period.  In short, the rapid, unforeseeable escalation of the pandemic beginning in March 2020 and the restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease forced the Debtors to immediately close all of their stores and terminate their store workers – a scenario they had not and could not have planned for when they developed their Planned Liquidation Process.[7]  No amount of additional discovery will change this.

---

[6] *See, e.g., Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1144 (N.D. Fla. 2020) (court is not required to "check its common sense at the door").

[7] Conversion Motion at ¶¶ 1-2.

5

Based on the foregoing and the reasons set forth below, the Bankruptcy Court's Opinion and Order granting summary judgment to the Trustee should be affirmed.

## II. <u>STANDARD OF REVIEW</u>

This appeal involves review of the Bankruptcy Court's grant of summary judgment, a purely legal determination governed by a *de novo* standard of review. *American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). The District Court assesses the record using the same standards for summary judgment employed by the Bankruptcy Court. *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 335 (3d Cir. 2004) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000)). A Bankruptcy Court abuses its discretion when its ruling is founded on a clearly erroneous finding of fact, an error of law, or a misapplication of law to the facts. *Marco v. Accent Pub. Co.*, 969 F.2d 1547, 1548 (3d Cir. 1992); *Hanover Potato Products, Inc. v. Shalala*, 989 F.2d 123, 127 (3d Cir. 1993).

Summary judgment is appropriate where the moving party can demonstrate "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Appellant is entitled to the evidence in the light most favorable to the non-movant, "draw[ing] all reasonable

inferences in favor of the non-moving party." *Fields v. Thompson Printing Co., Inc.*, 363 F.3d 259, 265 (3d Cir. 2004).

## III.   STATEMENT OF THE CASE

### A.   General Background

Prior to March 8, 2020 (the "Petition Date"), the Debtors had sold furniture for over 60 years, with 169 stores in Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia, and approximately 4,500 employees.[8]

On the Petition Date, Art Van Furniture, LLC ("AVF"), Sam Levin, Inc. ("SLI") and the other related above-captioned debtors (collectively, the "Debtors" or "Art Van") commenced their respective voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") to continue liquidating substantially all of their assets, an effort which had started before the Petition Date.  Upon the Debtors' motion (the "Conversion Motion"), based on the facts and circumstances described further below, on April 6, 2020, less than a month after the Petition Date, the Chapter 11 Cases were converted to chapter 7 proceedings (the "Cases").

The Debtors filed the Chapter 11 Cases with the express intention of winding down their affairs by liquidating their inventory through store closing sales (the

---

[8] *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Bankr. D.I. 12] ("Ladd Declaration") at 2 (Appendix AB_0001079-AB_0001290).

"GOB Sales"), paying down their secured debt, and using any remaining proceeds of their GOB Sales to wind-down their operations.[9]  In addition, as of the Petition Date, the Debtors were party to a binding letter of intent for a sale of 44 Levin and Wolf stores and related assets and operations to a third party buyer.  The GOB Sales, the Levin Sale (as defined and described below), and other actions taken by the Debtors in the Chapter 11 Cases were all part of the orderly liquidation and wind-down started by the Debtors before and continuing after the Petition Date (the "Planned Liquidation Process") to maximize the liquidation value of the estates' assets and the recoveries for the Debtors' creditors.[10]

**B.    The Planned Liquidation Process**

In the months leading up to the Petition Date, Art Van struggled under the weight of poor sales and $208.5 million in secured debt encumbering substantially all of its assets made up of: (i) $33.5 million in an asset-backed loan ("ABL Loan") from Wells Fargo Bank ("Wells Fargo") and (ii) a $175 million term loan from FS KKR Capital Corp.[11]  Art Van defaulted on the ABL Loan on February 5, 2020 and had only been able to obtain a forbearance from Wells Fargo through February 28, 2020, giving it 23 days to find a buyer, an investor or a means of recapitalizing the

---

[9] Ladd Declaration at ¶¶ 6 & 18.

[10] Ladd Declaration at ¶¶ 6, 16, 17, 18, 19, 20, 40, 41, 42 & 43.

[11] *See* Ladd Declaration at ¶¶ 7, 8, 13, 14, 16, 17, 18, 31-36.

business.  As a condition to the forbearance, Wells Fargo insisted that the Debtors begin preparing for GOB sales. [12]

In spite of the Debtors' efforts over the next 23 days in February 2020, by February 28, 2020, the Debtors were unable to secure financing or attract a going concern buyer.[13]  The forbearance period ended on that date, and the Debtors had no alternative but to commence an orderly wind-down of their operations and liquidate their assets.[14] To that end, before the Petition Date, the Debtors negotiated a wind-down budget with Wells Fargo ("Wind-Down Budget"), hired a liquidator, and announced publicly that after decades of operations, they were going out of business.[15]

---

[12] *See* Ladd Declaration at ¶¶ 14 & 36.

[13] *See* Transcript of March 10, 2020 hearing, at p. 55, line 25 to 57, line 20 (Appendix A000530-A000532); Ladd Declaration at ¶¶ 14-15.

[14] *See* Ladd Declaration at ¶¶ 16-18.

[15] *See* Ladd Declaration at ¶¶ 16-18; *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Bankr. D.I. 93] (the "Interim CC Order") at 13 (Appendix A000238-A000302).  On March 5, 2020, the Debtors entered into an agreement (the "Consulting Agreement") with HilcoMerchant Resources, LLC (the "Liquidator") (Appendix A001084-A001123). *See* Interim CC Order at 12. *See also* "Art Van Furniture to close all stores, including 24 in Illinois," *Chicago Tribune*, March 5, 2020, available at https://www.chicagotribune.com/business/ct-biz-art-van-shutting-down-20200305-2efw2ukfk5g2dfpzgooebjv7ry-story.html   (Appendix A000776-A000779) ("Art Van GOB Press Release").

As part of the Planned Liquidation Process, on March 4, 2020, SLI entered into a letter agreement (the "Levin LOI") pursuant to which it agreed to liquidate certain stores (most of which were in Pennsylvania), two distribution centers and certain other assets (the "SLI Assets") by a sale to Robert Levin (the "Levin Sale"). The Levin Sale was expected to be approved in bankruptcy and consummated in or about early April 2020.  Because the Debtors had no money to operate these stores (they only had the money that Wells Fargo had agreed to let them use to conduct the GOB Sales), Robert Levin agreed to extend $10 million of debtor-in-possession (DIP) financing to SLI (the "Levin DIP Loan") to facilitate the bankruptcy process to allow for the Bankruptcy Court's approval of the Levin Sale, which $10 million then would be repaid with and deducted from the sales proceeds of the Levin Sale.[16]

In sum, as of March 5, 2020, the Debtors had put into place an orderly full business liquidation process, comprised of the GOB Sales to liquidate AVF's assets including 125 stores and the Levin Sale to liquidate the SLI Assets.  On that same day, Art Van publicly announced that it was liquidating and going out of business,[17]

---

[16] *See* Levin DIP Motion; Interim *Order* on Levin DIP Motion [Bankr. D.I. 137] ("Interim Levin DIP Order").

[17] Indeed, Appellants have acknowledged and admitted that the Debtors began their liquidation plan at this time. *See Class Action Adversary Proceeding Complaint For Violation of WARN Act 29 U.S.C. § 2101, et seq.* [Adv. Docket No. 1] (the "Complaint") (Appendix AB_0001-AB_00011_), at ¶ 25 ("… Debtors began to execute on its planned liquidation.").

and on March 5, 2020, as part of its Planned Liquidation Process, although not required, AVF issued a WARN Act notice to approximately 1,400 potentially "affected employees" who worked in or reported to the WARN Locations.  Each of the Plaintiffs who worked at an affected location in Michigan were notified as follows:

> Art Van Furniture, LLC (the "Company") has made the difficult decision to wind-down its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI,49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations.

> The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). If no obligations exist, this notice is being provided to you voluntarily.

> All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at-will employment status with the Company.

> You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "GOB Sale WARN Notice") (Appendix AB_0001392).[18]

The Debtors' target date to end the GOB Sales was the end of April 2020.[19]

The GOB Sales commenced as expected, and went well at first.[20]

## C.   The Filing of the Chapter 11 Cases and the Rapid Escalation of the Pandemic Resulting in the Layoff

On the Petition Date, the Debtors filed their Chapter 11 Cases and filed "first day motions" to obtain approval of, *inter alia*, the Wind-Down Budget,[21] the Levin DIP,[22] and GOB Sales and the Consulting Agreement with the Liquidator.[23]   On March 11, 2020, the Bankruptcy Court entered an interim cash collateral order,

---

[18] Notably, given how transparent and proactive Art Van was from early on in informing its employees and the public and other parties in interest of Art Van's liquidation and wind-down, it cannot be credibly argued that the Debtors were engaged in gamesmanship to avoid any legitimate WARN Act liabilities.

[19] *See* Ladd Declaration at ¶ 18 (Debtors seeking to complete store closure sales in six to eight weeks from March 5, 2020).

[20] *Corrected Motion for Entry of Order Converting Their Chapter 11 Cases to Cases Under Chapter 7* [Bankr. D.I. 252] (Appendix A000304-A000333) (the "Conversion Motion") at ¶ 22.

[21] *See Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Bankr. D.I. 5] (Appendix A000908-A000934).

[22] *See* Levin DIP Motion; Interim Levin DIP Order.

[23] *See Debtors' Motion for Entry of Interim and Final Orders  (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores; (III) Authorizing Assumption of Consulting Agreement and (IV) Granting Related Relief* [Bankr. D.I. 52] (Appendix A000110-A000237).

authorizing the Debtors to use cash collateral in accordance with the Wind-Down Budget until April 7, 2020 (unless terminated earlier due to default or entry of a final order) to conduct the GOB Sales.  The Wind-Down Budget assumed that the GOB Sales would continue unabated through April 30, 2020, and provided that "the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis" is a default, and thus, the Debtors continued their ongoing GOB Sales.[24]

As found by the Bankruptcy Court, the Debtors' Planned Liquidation Process quickly became derailed by the pandemic's escalation in mid-March 2020.  In addition to the U.S. President declaring a national emergency on March, 13, 2020 (as noted above), on March 14, 2020, Governor Tom Wolf of Pennsylvania, where 25 of the Debtors' stores and two of their distribution centers were located, had issued guidance urging all non-essential businesses to close.[25]  Two days later, Governor Wolf amplified that guidance, declaring: "The Wolf Administration is

---

[24] Interim CC Order at pp. 34-35.

[25] *Wolf Administration Issues Guidance to Non-Essential Businesses as Part of COVID-19 Mitigation Efforts*, March 14, 2020, available at https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/ (Appendix AB_0001358-AB_0001359).

13

relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health ….”[26]

Similarly, on March 16, 2020, Governor Gretchen Whitmer of Michigan -- where the Debtors' headquarters, their main distribution center, and 82 of their stores were located -- entered an executive order that closed Michigan's bars, theaters, casinos and other public spaces.[27]  Governor Whitmer urged Michigan residents to "mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary." [28]

Then, on March 19, 2020, Pennsylvania became the first of the four states in which the Debtors' major retail and fulfillment operations were located to issue a "stay at home" or "shelter in place" type order.  Similar orders soon followed in

---

[26] *All Non-Life-Sustaining Businesses in Pennsylvania to Close Physical Locations As of 8 PM Today to Slow Spread of COVID-19,* March 19, 2020, available at https://www.governor.pa.gov/newsroom/all-non-life-sustaining-businesses-in-pennsylvania-to-close-physical-locations-as-of-8-pm-today-to-slow-spread-of-covid-19/ (Appendix AB_0001360-AB_0001361).

[27] *Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders*, March 16, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-521763--,00.html (Exh. O to Sandler Declaration) (Appendix AB_000833-AB_000836).

[28] *Id.*

Michigan, Ohio and Illinois, all of which also were in lock-down by March 23, 2020.[29]

Further, on March 19, 2020, the proposed purchaser for the Levin Sale notified the Debtors that they would not proceed with the transaction, and thus, the stores covered by the Levin Sale would also have to be immediately closed by the Debtors.[30]

Ultimately, the substantial, unprecedented restrictions on business and other activity that numerous state and local governments determined to be necessary to slow COVID-19's spread forced the Debtors to discontinue all retail operations and immediately shut down their stores – an outcome the Debtors had not and could not

---

[29] Pennsylvania: Gov. Tom Wolf, Executive Order, dated March 19, 2020, available at https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf (Ex. P to Sandler Declaration) (Appendix AB_000830-AB_000832); Michigan: Gov. Gretchen Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90487-522625--,00.html (Ex. Q to Sandler Declaration) (Appendix AB_000833-AB_000836); Ohio: Dir. of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020, available at https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf (Ex. R to Sandler Declaration) (Appendix AB_000837-AB_000849); and Illinois: Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19 Executive Order No. 8), dated March 20, 2020, available at https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf (Ex. S to Sandler Declaration) (Appendix AB_000837-AB_000849).

[30] Conversion Motion at ¶ 26.

15

have planned for when they developed their Planned Liquidation Process.[31]  Thus, on March 19, 2020, the Debtors made the painful decision to suspend all sales operations in all stores and terminate the majority of their employees, excluding workers who would be needed for the rest of the liquidation and wind-down process.[32]

Accordingly, on March 19, 2020, AVF issued a revised WARN Act notice to employees which stated:

> On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations.
>
> ***Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date.  The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").***
>
> All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals,

---

[31] Conversion Motion at ¶¶ 1-2.

[32] Conversion Motion at ¶ 25.

housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "<u>COVID WARN Notice</u>") (Appendix AB_0001392) (emphasis added).

Wells Fargo declared a default under the Interim CC Order, and terminated use of cash collateral as of March 24, 2020; later extended through March 31 and finally April 6, 2020.[33] Unable to continue the Chapter 11 Cases without the continued consent of the Debtors' secured lenders to use their cash collateral, the Debtors filed the Conversion Motion and the Chapter 11 Cases were converted to chapter 7 proceedings pursuant to an order entered on April 6, 2020.[34] In ruling on the Conversion Motion, Judge Sontchi stated:

> This case is very unfortunate. It's really been a parade of unfortunate events that has kind of conspired to put a long-standing, solid business into liquidation. And, as I sit here today, I certainly don't have enough information to blame anyone or anything other than the coronavirus and the disaster it has left in its wake.[35]

---

[33] Conversion Motion at ¶ 27.

[34] *See* Order Granting Debtor's Amended Motion to Convert [Bankr. D.I. 263] (Appendix A001344-A001349) ("<u>Conversion Order</u>').

[35] *See* Transcript of April 6, 2020 Hearing, at 28, line 24 to p. 29, line 5 (Appendix A001378-A001379).

DOCS_LA:344272.10 05233/003

Upon the conversion, Alfred Giuliano was appointed as the chapter 7 trustee [Bankr. D.I. 264] (Appendix A000334).

## D.     The Adversary Proceeding and the Bankruptcy Court Ruling

On March 23, 2020, Appellants initiated the adversary proceeding (the "Adversary Proceeding") by filing the Complaint (Appendix A000335-A000345) on behalf of themselves and other allegedly similarly situated former employees in which they assert that the Debtors violated the WARN Act.  On November 12, 2021, the Trustee filed his *Motion for Summary Judgment* [Adv. D.I. 43 & 44] (Appendix AB_00012-AB_00013 and AB_00014-AB_00045, respectively).   On March 21, 2022, the Bankruptcy Court issued its Opinion and Order, pursuant to which the Bankruptcy Court granted the Trustee's SJ Motion, specifically ruling that (i) the "liquidating fiduciary" exception under the WARN Act does not apply to the instant case; (ii) the UBC Exception applies; and (iii) the COVID-19 pandemic falls within the Natural Disaster Exception.

Appellants appealed the Opinion and Order on or about April 4, 2022 [Adv. D.I. 66] (Appendix AB_0001069-AB_0001073).  The Trustee filed his Notice of Cross-Appeal pursuant to 28 U.S.C. § 158(a) and Bankruptcy Rules 8001 and 8002 [Adv. D.I. 72] (Appendix AB_0001074-AB-0001078).  The Trustee cross-appealed only that portion of the Opinion that found that the "liquidating fiduciary" exception does not apply to the facts set forth in the Adversary Proceeding and the Order only

to the extent it incorporated that portion of the Bankruptcy Court's Opinion holding that the "liquidating fiduciary" exception to alleged WARN Act liability was inapplicable.  *See* 638 B.R. at 533-36.

### III.    SUMMARY OF ARGUMENT[36]

First, the Bankruptcy Court did not abuse its discretion in entering summary judgment for the Trustee on the WARN Act's Natural Disaster and UBC Exceptions before Appellants had the opportunity to conduct further discovery.  Second, the Bankruptcy Court did not err in finding that the WARN Act's Natural Disaster Exception and UBC Exception excused Art Van from complying with the WARN Act's 60-day notice requirement.

As discussed herein, as ruled by the Bankruptcy Court, all relevant, material facts are undisputed.  Indisputably, the COVID-19 pandemic was an unprecedented, unpredictable major public health emergency in the United States, with many unknowns at the relevant times (such as how long the next business shutdown would be and the adverse extent thereof).  The Bankruptcy Court did not abuse its discretion in ruling that no further evidence was needed to grant summary judgment to the Trustee.

---

[36] Capitalized terms used but not defined in this Summary of Argument have the meanings ascribed to them in the balance of this brief, and all facts adverted to herein are supported by record citations in the balance of this brief.

The Bankruptcy Court properly granted summary judgment to the Trustee because, as discussed below, the Debtors are not subject to WARN Act liability because: (1) assuming *arguendo* the Debtors were "employers" subject to the WARN Act as of the date of the Layoff, the UBC Exception applies because of their inability to conduct their Court-approved post-petition GOB Sales as a result of COVID-19 and the unprecedented governmental issuance of orders requiring businesses to shut down and people to shelter in place; and (2) the Natural Disaster Exception applies because the Layoff was clearly and unequivocally caused by COVID-19, a natural disaster.

## IV.   ARGUMENT

**A.   The Unprecedented COVID-19 Pandemic and the Attendant Immediate Governmental Shutdown of Non-Essential Businesses Including the Debtors' Stores and the Mandated "Stay at Home" Orders Were "Not Reasonably Foreseeable" and Thus, the UBC Defense Applies and the Debtors Were Not Subject to the 60-Day Notice Provisions of the WARN Act.**

The COVID-19 pandemic was a circumstance that was not reasonably foreseeable during the 60-day period prior to the Layoff.  As a matter of law, the Debtors therefore cannot be held liable for failure to provide 60 days' notice of the Layoff.   Specifically, 29 U.S.C. § 2102(b)(2)(A) provides that "[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances **that were not reasonably foreseeable as of the time that notice would have been required.**"  29

20

U.S.C. § 2102(b)(2)(A) (emphasis added).  Importantly, the UBC exception is <u>not</u> narrowly construed in favor of employees.  *See, e.g., In re AE Liquidation, Inc.,* 556 B.R. 609, 617-18 (D. Del. 2016), *aff'd,* 866 F.3d 515 (3d Cir. 2017); *In re Jevic Holding Corp.,* 496 B.R. 151, 163 n.36 (Bankr. D. Del. 2013) (noting that while Department of Labor requires "faltering company" exception be narrowly construed, there is no such requirement for UBC exception); *see also* 54 Fed. Reg. 16,061 (1996) ("The Department has reviewed the legislative history and agrees it may not [be] appropriate to say that the unforeseeable business circumstances . . . exception[] should be narrowly construed.").  Further, courts evaluate the UBC exception objectively, at the time the decisions were made, and not with the benefit of 20/20 hindsight.  *See AE Liquidation,* 556 B.R. at 618; *Jevic,* 496 B.R. at 161; *Watson v. Mich. Indus. Holdings, Inc.,* 311 F.3d 760, 764 (6th Cir. 2002) ("In making this determination, a reviewing court must be careful to avoid analysis by hindsight . . .").

The Third Circuit Court of Appeals has established that, under the WARN Act, a layoff becomes reasonably foreseeable when it becomes "probable" (more likely than not) that it would occur; **a clear probability of layoffs** is necessary to trigger the WARN Act notice requirement.  *Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.),* 866 F.3d 515, 528 (3d Cir. 2017) (company had received numerous assurances that funding for a transaction that would have allowed it to

continue its operations was imminent, and thus, the company was entitled to invoke the UBC Exception).[37]   *See also Hotel Employees & Restaurant Employees International Union Local 54 v. Elsinore Shore Associates*, 173 F.3d 175 (3d Cir. 1999) (casino's closure was not reasonably foreseeable and thus the UBC Exception applied to excuse the casino's failure to notify its employees prior to its being shut down by the New Jersey Casino Control Commission).

Further, as explained by Bankruptcy Judge Shannon:

The Department of Labor's ("DOL") regulations state that "[a]n important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some ***sudden, dramatic, and unexpected action or condition outside the employer's control***." 20 C.F.R. § 639.9(b)(1).  The DOL's test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of a particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services.  *Id*. § 639.9(b)(2).

---

[37] Notably, the bankruptcy court in the proceedings below in *AE Liquidation* had granted the trustee's motion for summary judgment on the basis that the applicable circumstance there was unforeseeable for purposes of WARN Act liability.  *In re AE Liquidation, Inc*., 522 B.R. 62 (Bankr. D. Del. 2014) (Judge Walrath).   The bankruptcy court's decision was affirmed by the district court, and both decisions were affirmed by the Third Circuit Court of Appeals in the afore-cited *AE Liquidation* case.

*Czyzewksi v. Jevic Transp. Inc. (In re Jevic Holding Corp.)*, 496 B.R. 151, 161 (Bankr. D. Del. 2013) (Hon. B. Shannon) (emphasis added).[38]

Based on the foregoing, the UBC Exception is applicable here.  First, as discussed further in Section B below, the COVID-19 pandemic was clearly the immediate cause of the Debtors' abrupt change-of-course determination to abandon the Planned Liquidation Process and immediately shut down their business.  The pandemic and the unprecedented extent and effects thereof were sudden, dramatic and outside the Debtors' control, and made it impossible for the Debtors to continue their GOB Sales post-petition as planned as the various governmental authorities required non-essential businesses to close and people to stay at home or shelter in place to limit the spread of COVID-19.  The threat of infection, illness and death from COVID-19 made customers stay away from the GOB Sales even prior to the mandatory shut down orders, but regardless, as of March 19, 2020, Pennsylvania had locked down, and Michigan would follow shortly thereafter.

Moreover, on January 18, 2020 and thereafter (the 60-day period prior to the Layoff), the Debtors could not reasonably have foreseen that the threat of infection

---

[38] *See also JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 124-25 (2d Cir. 2022) (holding "the COVID-19 pandemic, coupled with the state government's orders restricting the activities of nonessential businesses, constitute an occurrence beyond the parties' reasonable control . . . . that cause large-scale societal disruptions, are beyond the parties' control, and are not due to the parties' fault or negligence" which permitted defendant to terminate contract pursuant to force majeure clause).

and death from COVID-19 would be so profound that hundreds of millions of people in the United States would be afraid to leave their homes, and governments would be ordering the public to stay at home and closing non-essential businesses, such as the Debtors' stores, across the nation.

In sum, as the Bankruptcy Court properly found and ruled:

> Here, it is undisputed that the Debtors were in dire financial straits leading up to the Chapter 11 filing. It is also undisputed that the Debtors filed Chapter 11 to pursue an orderly wind-down of operations and liquidation of their assets. On March 5, 2020, the Debtors provided the First WARN Notice to many of their employees, anticipating the winding-down of operations and permanent layoffs by May 5, 2020. It is also undisputed that in mid-March 2020, COVID-19 caused Pennsylvania, and then Michigan, and then other states where the Debtors operated, to issue "stay at home" or "shelter in place" orders. This unquestionably impacted the Debtors' operations. The Debtors issued the Second WARN Notice as COVID-19 and the ensuing government-ordered shutdowns prevented the Debtors from operating and completing its anticipated wind-down plans.

> Given these undisputed facts, the Plaintiffs' proffered evidence that COVID-19 was merely a pretext for the mass layoff is tenuous at best. Statements showing that the Debtors' actions were unanticipated or resulted in greater financial distress do not indicate disputed facts concerning the cause of the layoff. Rather, those facts underscore that the impact of COVID-19 was sudden and unexpected to other parties as well as the Debtors….

> . . . . The undisputed facts support the finding that the COVID-19 was the proverbial "straw that broke the camel's back" and caused the March 20, 2020 layoff. Even viewing all inferences in favor of the Plaintiffs, the Plaintiffs' proffered evidence does not demonstrate disputed issues of material facts that cast doubt on that causation.

*Stewart v. Art Van*, 638 B.R. at 538-39.[39]

The Bankruptcy Court properly granted the Trustee summary judgment on the basis of the UBC Exception, and this Court should affirm.

**B.      The Bankruptcy Court Did Not Err in Finding the COVID-19 Pandemic Directly Caused the Layoff for Purposes of the UBC Exception and Natural Disaster Exception.**

Appellants contend that the factual record below did not establish that COVID-19 caused the Layoff.  Opening Brief, pp. 34-35.  This is incorrect.

In *Easom*, the Fifth Circuit noted:

> [P]roximate case is not synonymous with sole cause. A proximate cause requirement merely "serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity."

*Easom v. US Well Servs*, 2022 U.S. App. LEXIS 16556 at *16 (*quoting Paroline v. United States*, 572 U.S. 434, 444 (2014)).[40]  No one could reasonably describe the causal link between the Layoff and COVID-19 and the government ordered shut-

---

[39] The Bankruptcy Court also rejected Appellants' argument that the COVID WARN Notice was insufficient to allow application of the UBC Exception, noting, "The statement in the Second WARN Notice is brief, but that is what the statute requires. The statement specifically mentions why the shortened notice was necessary - - that the unforeseen effects of COVID-19 prevented the Debtors from completing the planned wind-down of the retail operations. The notice is sufficient to pass muster." 638 B.R. at 540.

[40] As discussed in Section C.2 hereof, the Fifth Circuit Court of Appeals in the *Easom* case adopted a proximate causation standard for the Natural Disaster Exception, however, as also discussed herein, the Fifth Circuit's reasoning was flawed.

25

downs and stay-at-home orders as "mere fortuity." As was noted above in Section A, the Bankruptcy Court determined that COVID-19 was the proximate cause of the Layoff, citing all the necessary undisputed facts in the record and dismissing Appellants' unfounded suggestions, insinuations and speculation regarding the Debtors' board's decision to implement the Layoff as not bearing on causation itself.[41]

In particular, Appellants' assertions that attorneys made statements at the hearing that were "contrary representations," "hid" information, gave "false impression[s]," had "inconsistencies" and "painted drastically different pictures of business conditions" are not only unfounded and unsubstantiated, they are completely undermined by the qualifications and reservations made by counsel at

---

[41] *See Stewart v. Art Van*, 638 B.R. at 538-39 ("On March 5, 2020, the Debtors provided the First WARN Notice to many of their employees, anticipating the winding-down of operations and permanent layoffs by May 5, 2020. It is also undisputed that in mid-March 2020, COVID-19 caused Pennsylvania, and then Michigan, and then other states where the Debtors operated, to issue 'stay at home' or 'shelter in place' orders. This unquestionably impacted the Debtors' operations. The Debtors issued the Second WARN Notice as COVID-19 and the ensuing government-ordered shutdowns prevented the Debtors from operating and completing its anticipated wind-down plans…. The undisputed facts support the finding that the COVID-19 was the proverbial 'straw that broke the camel's back' and caused the March 20, 2020 layoff. Even viewing all inferences in favor of the Plaintiffs, the Plaintiffs' proffered evidence does not demonstrate disputed issues of material facts that cast doubt on that causation.").

the hearing, quoted by Appellants themselves in the Opening Brief.[42]  In short, as made clear by Debtors' counsel at the hearing, there were no agreements or deals in place to potentially mothball the GOB Sales and possible sale of the Levin Stores to another buyer.  Debtors' counsel simply made statements that some other outcome, other than immediate shutdown and liquidation, might be possible.

Appellants essentially assert that the Debtors' determination to immediately shut their stores and abandon the Planned Liquidation Process was a bad decision. However, as explained by the Bankruptcy Court these baseless insinuations are irrelevant to the causation analysis.  *See Stewart v. Art Van*, 638 B.R. at 538-39 ("The Plaintiffs' argument that temporary furloughs could have been a better option for the Debtors is not a factual dispute, but merely debating the Debtors' actions in hindsight. The Court should evaluate the UBC WARN Act exception objectively and at the time the decisions were made.  The undisputed facts support the finding that the COVID-19 was the proverbial 'straw that broke the camel's back' and caused the March 20, 2020 layoff.").

---

[42] *See, e.g.,* Opening Brief, p. 25 ("Debtors' counsel made 'clear' that 'we are ***trying to explore*** with our lenders and our other stakeholders … other options short of outright liquidation." (emphasis added)); p. 26 (quoting Debtors' counsel: "So let me just say then, ***conceptually***, we are looking at the ***possibility*** of … going idle or going into a state of dormancy for a period of time, and then the ***possibility*** then of [other options]…. [There a number of scenarios ***under consideration*** … we are right now, engaging in a dialogue with Wells Fargo and our term loan lenders to see ***if there's a way*** to pursue that alternative." (emphases added)).

27

In sum, the Bankruptcy Court's detailed findings that COVID-19 was the proximate cause of the Layoff, for purposes of the UBC Exception, the Natural Disaster Exception[43] or otherwise, is sound, straightforward and supported by the evidentiary record.

**C.     The Debtors Were Not Required to Provide Any Notice Because the Layoff Was Due to the COVID-19 Pandemic -- a "Natural Disaster" For Purposes of the WARN Act.**

**1.     The Pandemic Is a Natural Disaster**

The Debtors were not required to give any notice because the March 20, 2020 Layoff was "due to" the COVID-19 pandemic, which falls within the Natural Disaster Exception to the WARN Act.  29 U.S.C. § 2102(b)(2)(B) provides: "No Notice under this chapter shall be required if the plant closing or mass layoff is due to ***any form of natural disaster***, ***such as*** a flood, earthquake, or the drought currently ravaging the farmlands of the United States" (emphasis added).  While the statute does not define "natural disaster," the implementing regulations provide:

> The "natural disaster" exception in section 3(b)(2)(B) of WARN applies to plant closings and mass layoffs due to ***any form of a natural disaster***. . . (1) Floods, earthquakes, droughts, storms, tidal waves or

---

[43] Contrary to Appellants' assertions, logically and as a matter of policy, a natural disaster need not destroy the employer's infrastructure in order to be the direct cause of a mass layoff.  Generally, businesses need capital, labor, and customers, and a disaster that effectively shuts down the business's stores, restaurants or factories, for an unknown period of time, is no less the cognizable cause of layoffs than a disaster that destroys the business's capital including infrastructure.

28

tsunamis *and similar effects of nature* are natural disasters under this provision.

20 C.F.R. § 639.9(c) (emphasis supplied).

While Appellants devote several pages in their Opening Brief as to what constitutes a "natural disaster," an ordinary, logical reading of this statutory exception resolves the issue. *See Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1144 (N.D. Fla. 2020) (court is not required to "check its common sense at the door"). Notably, in the above-quoted statute, the phrase "any form of natural disaster" is used, instead of simply "natural disaster" -- suggesting a very broad, flexible reading of what type of occurrence qualifies (more so than if the statute simply stated "any natural disaster"). *See, e.g., United States v. Gonzales*, 520 U. S. 1, 5 (1997) (the word "any" demands a broad interpretation). Moreover, the non-exclusive list of examples of forms of natural disaster in the WARN Act (floods, *etc*.) need not and should not be read to materially limit what constitutes a natural disaster in this world, as argued by Appellants. The WARN statute cites as one example of "any form of natural disaster," "the drought currently ravaging the farmlands of the United States."[44] This reference highlights that certain then-current natural disasters were

---

[44] During 1988 and beyond, various parts of the United States were experiencing exceptionally severe droughts which caused many billions of dollars in property damage, as well as thousands of deaths resulting from the attendant heat waves. *See, e.g.,* Impact of the Drought on Prices and Production : Hearing Before the Subcommittee on Economic Stabilization of the Committee on Banking, Finance,

a focus of Congress and a specific impetus for the WARN Act, and a factor in drafting the statutory list of examples. That the list is so tied to the then-current events in 1988 (the year of enactment of the WARN Act) shows the limited, intended utility of the list, as time lapses and other examples of natural disasters may occur which should reasonably and logically be within the ambit of the natural disaster exception.

The COVID-19 pandemic was at all relevant times a "natural disaster." COVID-19 is a highly infectious disease caused by a virus that is spread from person to person. COVID-19 is transmitted through a natural process, and the wide-scale spreading of COVID-19 was a natural disaster.[45] COVID-19 is mainly spread between people who are in close contact with one another and through respiratory

---

and Urban Affairs, House of Representatives, 100th Congress, 2nd Session, July 6, 1988, available at https://fraser.stlouisfed.org/title/impact-drought-prices-production-836.

[45] It is simply irrelevant for adjudicating the issues in this matter whether the COVID-19 virus was created or manipulated in a lab somewhere or it stemmed from bats or other animals in China. The main goal of WARN is to give fair notice to workers under the circumstances, and the natural disaster exception broadly and logically recognizes that no or less notice may be reasonably required of an employer in the face of an outside, massive biological event like the COVID-19 pandemic that suddenly and unexpectedly harms the employer and its assets (such as stores subject to government shutdowns) or resources (including workers who are ill or decide not to come to work because of the health risks). *See, e.g.,* "nature," *Merriam-Webster Dictionary* (2022) ("nature" defined as "the external world in its entirety"), available at https://www.merriam-webster.com/dictionary/nature.

droplets landing in the mouths or noses of, or inhaled by, people nearby, produced when an infected person coughs or sneezes.  The COVID-19 pandemic has been a devastating event for the United States.   Given the severity and extent of the COVID-19 pandemic, as discussed herein, starting in March 2020, the World Health Organization, various states and then-President Trump declared the pandemic to be a major public health emergency.  Based on these indisputable facts and a plain, common sense reading of the statutory language, it cannot be reasonably argued that the COVID-19 pandemic was somehow not a "natural disaster."[46]

---

[46] Various cases from outside the WARN Act context support the Bankruptcy Court's determination that COVID-19 was a natural disaster, demonstrating the ordinary, broad understanding of what constitutes natural disasters.  *See, e.g., JN Contemporary Art, LLC v. Phillips Auctioneers LLC*, 2020 U.S. Dist. LEXIS 237085 (S.D.N.Y. Dec. 16. 2020) (COVID-19 qualified as a "natural disaster" for purpose of applying a force majeure clause in contract dispute); *aff'd on other grounds* 29 F.4th 118 (2d Cir. 2022); *Bay City Realty, LLC v. Mattress Firm, Inc.*, 2021 U.S. Dist. LEXIS 67054 (E.D. Mich. Apr. 7, 2021) (in breach of contract action, COVID-19 pandemic and Michigan governor's business shutdown order in March 2020 were unforeseeable events that frustrated purpose of parties' lease); *Black Voters Matter Fund v. Raffensperger*, 478 F. Supp. 3d 1278, 1316  (N.D. Ga. 2020) (comparing COVID-19 cases with "other natural disaster cases" in the voting rights context), *aff'd* 11 F.4th 1227 (11th Cir. 2021); *Friends of Danny DeVito v. Wold*, 227 A.3d 872, 889 (2020) ("COVID-19 pandemic is, by all definitions, a natural disaster and catastrophe of massive proportions"), *cert. denied* 141 S. Ct. 239 (2020); *Commonwealth v. Mills*, 104 Va. Cir. 350, 351-53 (Cir. Ct. Madison Cty. 2020); ("the Coronavirus rises to the level of a natural disaster as a communicable disease of a public health threat as defined in" the Virginia Code); *Commonwealth v. Vila*, 104 Va. Cir. 389, 393 (Cir. Ct. Fairfax Cty. 2020) (coronavirus natural disaster for purpose of state speedy trial act). *See also Badgley v. Varelas*, 729 F.2d 894, 902 (2d Cir. 1984) (referring to "natural disasters such as fire or disease"); *NRDC v. EPA*, 896 F.3d 459, 464 (D.C. Cir. 2018) ("an ordinary reading

31

Relying, in part, on *Easom v. US Well Servs*, 527 F.Supp. 3d 898 (S.D.Tex. 2021), the Bankruptcy Court correctly concluded that COVID-19 was (i) a "disaster" because it killed two million people and infected one hundred million more in one year and (ii) "natural" because human beings were not responsible for starting or consciously spreading it. *Stewart v. Art Van*, 638 B.R. at 541. Appellants' reliance on the Fifth Circuit's recent reversal of the District Court for the Southern District of Texas, in which it "decline[d] to expand the definition of 'natural disaster' beyond what is justified by the Act's statutory language, context and purpose," is not persuasive, because the Fifth Circuit's determination is inconsistent with both the language of the WARN Act and the relevant regulations.

In *Easom v. US Well Servs*, 2022 U.S. App. LEXIS 16556 (5th Cir. June 15, 2022), the Fifth Circuit applied the doctrine of "noscitur a sociis" ("it is known by its associates") and concluded that "the appearance of 'natural disaster' in a list with 'flood, earthquake or drought' suggests that Congress intended to limit 'natural disaster' to hydrological, geological and metrological events". *Easom v. US Well Servs*, 2022 U.S. App. LEXIS 16556, at *11. As was noted above, neither the statute nor the regulations limit the term "natural disaster" in such a way. To the contrary, they specifically contemplate that "any form of natural disaster" will qualify.

---

of 'natural event' summons images . . . and organic processes, such as viral epidemics").

The Fifth Circuit further reasoned that Congress' failure to specifically include the terms "pandemic" and "virus" "justifies the inference that those terms were deliberately excluded." *Id*.  Again, had Congress wanted to limit the definition of a "natural disaster" to only the items specifically included in the statute it could have done so, and it did not.  Instead, Congress used the broad term "any form of natural disaster" followed by "such as".

Finally, the Fifth Circuit reasoned that it must narrowly construe anything that permits the reduction of the 60-day notice period (*i.e*. the exceptions) because reducing the notice period runs counter to the purpose of the WARN Act, which is to provide employees with "transition time to adjust to the prospective loss of employment to seek and obtain alternative jobs and, if necessary to enter skill training or retraining that will allow these workers to successfully compete in the job market." *Id*. at *12 (quoting 20 C.F.R. § 639.1(a)).  This reasoning does not make sense in the context of a worldwide pandemic.  The Layoff occurred because the states in which the Debtors operated were subject to mandatory, government ordered closures and the confinement of residents to their homes.  There were no retraining programs.  There were no new jobs.  Rather, there was widespread government mandated (and government subsidized) waiting at home until the pandemic subsided and governors of each state permitted businesses to reopen.  Construing the

exceptions narrowly to ensure that workers got the benefit of a retraining period makes no sense in this context.

Accordingly, the Debtors were not required to give notice of the Layoff because COVID-19 is a "natural disaster."

### 2.     The But-For Causation Standard Applies to the Natural Disaster Exception

In its Opinion, the Bankruptcy Court did not resolve the issue of the proper causation standard to be used in applying the "due to' statutory language in the Natural Disaster Exception because it had found that the pandemic was the immediate, direct cause of the Layoff.  *See* 638 B.R. at 542 ("The Court does not need to decide whether it agrees that the 'but for' standard applies to the natural disaster exception.  Even assuming that the more stringent standard of causation applies here, the Court has already analyzed the causation issue in the discussion of the UBC exception, *supra*.  The undisputed facts in this case support the finding that the COVID-19 was an immediate cause of the March 20, 2020 layoff.").

As discussed above in Section IV.B, COVID-19 was the direct cause of the Layoff under *any* standard of causation, but in any event, but-for causation is the correct standard for analyzing the Natural Disaster Exception.  But-for causation asks whether an effect would have occurred in the absence of a particular event, not whether that factor or event directly or exclusively caused the effect.  *See U.S. v. Salinas*, 918 F.3d 463, 466 (5th Cir. 2019) ("A proximate-cause inquiry would ask

34

how directly each cause affected the final outcome, but the but-for causation standard asks simply whether the outcome would have occurred in the absence of the action."); *Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1739 (2020) (noting that "[the but-for standard] can be a sweeping standard' and "[o]ften events have multiple but-for causes," and that "a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.").[47]

Requiring the subject natural disaster to have directly caused the Layoff for the Natural Disaster Exception to apply is an overly narrow construction that in many cases would nullify the protection afforded by WARN Act section 3(b)(2)(B).  Based on a plain, ordinary reading of the text of the Natural Disaster Exception, the "due to" language reasonably signifies a less stringent, more flexible causation standard – a but-for causation.  Common sense and the structure of the WARN Act reinforce the Trustee's textual interpretation.

---

[47] Applying such standard here, but for the threat of infection and death from COVID-19, the foot traffic in the Debtors' stores for the GOB Sales would have continued apace, and Appellants would have worked throughout their 60-days' notice period under the March 5, 2020 WARN Notice. But for the threat of infection and death from COVID-19, the Debtors' employees would not have been afraid to come to work. But for the threat of infection and death from Covid-19, the Debtors would not have been under threat of compulsory closures in every state in which it did business. But for the threat of infection and death from COVID-19, the Governor of Pennsylvania would not have ordered the Debtors to close all of their stores in Pennsylvania by 8 pm on March 19, 2020. But for the threat of infection and death from COVID-19, the Debtors would not have issued the COVID WARN Notice on March 19, 2020 and would not have terminated Appellants on March 20, 2020.

35

Requiring proof of direct cause here instead of but-for cause would effectively eliminate the advantages of the WARN Act's standalone Natural Disaster Exception. By their nature, natural disasters adversely and indiscriminately affect large areas and often entire communities (employers and employees alike) without warning. Instead of burdening employers and courts with WARN Act litigation after a natural disaster, a more flexible Natural Disaster Exception facilitates supporting and rebuilding communities when the disaster subsides. Though employers often have superior information about their upcoming employment decisions -- information employees can use to make informed decisions about their own lives -- the Natural Disaster Exception recognizes that this is not always the case and that holding employers liable for not providing 60 days' notice would sometimes harm businesses and their communities.[48]

---

[48] Appellants urge this Court to follow the Department of Labor's regulatory guidelines found in 20 CFR § 639.9(c)(4), which state that the Natural Disaster Exception does not apply if the layoffs are an "indirect" result of a natural disaster. But as the District Court in *Easom* observed, it is axiomatic that "[w]hen, as here, a regulation conflicts with the unambiguous language of a statute, the statute controls." *Easom v. US Well Servs.*, 527 F.Supp. 3d 898, 906 (S.D. Tex. 2021), *rev'd and remanded by*, 2022 U.S. App. LEXIS 16556 (5th Cir. June 15, 2022) (finding the phrase "due to" to be ambiguous and granting "controlling weight" to the DOL regulation). *See, e.g., Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 84 (2002) (a regulation penalizing an employer for not informing an employee that leave would be counted as Family and Medical Leave Act conflicted with the statute and was invalid). Similarly, deference to the regulations pursuant to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), does not apply

36

Congress in 1988 considered a proposed version of the Natural Disaster Exception that would have described the exception as applying when a layoff is "due, *directly or indirectly*, to any form of natural disaster," but ultimately enacted the exception without the "directly or indirectly" language.  134 Cong. Rec 16,122-23 (1988).  *See also* 134 Cong. Rec. S8689 (daily ed. June 28, 1988) (remarks of Sen. Dole) (explaining that the language was removed because "there was some question what 'directly' means and what 'indirectly' means").[49]  As a matter of basic statutory construction, the foregoing strongly suggests that Congress intended a

---

where the statute is clear.  *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2291 n.9 (2021).

[49] The legislative history supports a more flexible and broad causation standard such as the but-for causation standard, rather than a direct or otherwise more stringent causation standard.  Indeed, Senator Robert Dole (R-KS) explained: "So I think the amendment [striking the words "directly or indirectly"] is clear.  I think there was some question what 'directly' means and what 'indirectly' means.  Now it is going to be a matter of proof, and I think that is what we intended in the first place.  It may not be just those who serve the farmer.  It might be somebody downstream.  It might be a barge operator.  It might be someone else."  134 Cong. Rec. S8689 (daily ed. June 28, 1988) (remarks of Sen. Dole).  Senator Howard Metzenbaum (D-OH), a co-sponsor of the WARN Act bill, also made statements suggesting that the applicable causation standard can be something less demanding than direct causation and that there may be grey areas: "This is not a carte blanche so that anybody who claims they had some impact, however small, because of the drought would not have to give notice.  I think you are going to have to be able to determine whether or not the closing or mass layoff was, indeed, actually due to the natural disaster ….  I think it may wind up having to be, in some instances, a court issue, were some employer to attempt to claim that somehow, in some way, the farmers could not get to work because they were on the farms and therefore they had to close the plant."  134 Cong. Rec. S8689 (daily ed. June 28, 1988) (remarks of Sen. Metzenbaum).

DOCS_LA:344272.10 05233/003

more generalized, flexible causation standard, instead of a strict direct or proximate cause standard.

Further, the United States Supreme Court has held in a non-WARN context that Congress's use of the phrase "because of" (a phrase comparable to "due to" (*see, e.g.,* Merriam-Webster Dictionary, definition of "due to" (preposition) ("as a result of: BECAUSE OF") (available at https://www.merriam-webster.com/dictionary/due%20to)) demonstrates its intention to incorporate but-for causation and cautioned courts against reading more stringent causation requirements into statutes that impose only but-for causation. *See Bostock*, 140 S. Ct. at 1739 ("Congress could have taken a more parsimonious approach.  As it has in other statutes, it could have added 'solely' to indicate that actions taken 'because of' the confluence of multiple factors do not violate the law.").

Accordingly, the applicable causation standard is but-for causation, however, in any event, COVID-19 was the direct cause of the Layoff under *any* standard of causation.  The Bankruptcy Court's decision should be affirmed.

**D.**   **The Bankruptcy Court Did Not Err in Denying Appellants Any Further Discovery in the Adversary Proceeding.**

As discussed above, all relevant, material facts are undisputed and on this basis and the record before it, the Bankruptcy Court properly granted summary judgment to the Trustee.  In order to justify the need for additional discovery, Appellants were required to specify the discovery they sought that could overcome

38

the Trustee's summary judgment motion.[50]   *See, e.g., Simpson v. Panhandle S. Plains Fair Ass'n*, 2001 U.S. Dist. LEXIS 15080, at \*4-\*5 (N.D. Tex. Aug. 9, 2001) ("the summary judgment rules do not require that discovery take place before a motion for summary judgment can be granted"; for a proper request for continuance under Fed.R.Civ.P. 56(f), the nonmoving party must "(1) present specific facts why he was unable to respond substantively in opposition to the motion; and, (2) specifically demonstrate how not granting the summary judgment or granting additional time for discovery will rebut the moving party's evidence that there is no genuine issue of material fact. [citations omitted]  In other words, the party opposing summary judgment 'must show how the additional discovery will defeat the summary judgment motion.' [citation omitted]   'Vague assertions by the non-moving party that discovery will uncover unspecified facts are not enough to trigger Rule 56(f) protection.'"); *Shelton v. Lemons*, 486 Fed.Appx. 395, 396-97 (5th Cir. 2012) (similar).

---

[50] It is disingenuous for Appellants to complain about the purportedly little discovery obtained in the Adversary Proceeding.  The Debtors' intentions and Planned Liquidation Process are evidenced by the voluminous, publicly filed documents that are part of the record in these cases and have long been available to Appellants on the Court's docket in the bankruptcy cases.  In addition, Appellants' counsel appeared at numerous hearings during the Chapter 11 Cases.  (*See* U.S. Bankruptcy Court - District of Delaware Confirmed Telephonic Appearance Schedule (Honorable Christopher S. Sontchi) in Art Van's Chapter 11 case for hearing dates March 26, 2021, April 3, 2021, and April 6, 2021 (Docket Nos. 192, 240, 262 in No. 20-10553.)  Finally, the Trustee provided informal discovery to Appellants' counsel both prior to, in connection with and after a mediation between the parties.

Appellants have not met this burden.  Rather, they speculate in their Opening Brief there may be a smoking gun to be uncovered in discovery. Opening Brief, p. 30.  As ruled by the Bankruptcy Court, Appellants' insinuations and suggestions are simply inapposite: "The Plaintiffs' argument that temporary furloughs could have been a better option for the Debtors is not a factual dispute, but merely debating the Debtors' actions in hindsight. The Court should evaluate the UBC WARN Act exception objectively and at the time the decisions were made. The undisputed facts support the finding that the COVID-19 was the proverbial 'straw that broke the camel's back' and caused the March 20, 2020 layoff."  638 B.R. at 539.    No additional discovery is needed or justified.

## V.    <u>CONCLUSION</u>

For each of the reasons set forth herein, the Trustee respectfully submits that the Bankruptcy Court's Opinion and Order granting summary judgment to the Trustee with respect to the "natural disaster" and "unforeseeable business circumstances" exceptions under the WARN Act should be affirmed.

Dated:  July 25, 2022
        Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Bradford J. Sandler*
Bradford J. Sandler (Bar No. 4142)
Beth Levine (New York Bar No. 2572246)
(admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor

P.O. Box 8705
Wilmington, Delaware 19899
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  bsandler@pszjlaw.com
        blevine@pszjlaw.com
        crobinson@pszjlaw.com
        pkeane@pszjlaw.com

Counsel to Alfred T. Giuliano, Chapter 7
Trustee to Art Van Furniture, LLC, *et al.*

41

## <u>CERTIFICATE OF COMPLIANCE</u>

### Fed. R. Bankr. P. 8015(a)(7)(B)(i)

The undersigned counsel hereby certify that this brief complies with the type-volume limitation of Fed. R. Bankr. P. 8015(a)(7)(B)(i). The text of this brief was prepared in Times New Roman 14 point font.  According to Microsoft Word's word count feature, the brief includes 11,630 words, including the caption page, corporate disclosure statement, table of contents, table of authorities, signature blocks and certificates of compliance and service.

Dated:  July 25, 2022                    PACHULSKI STANG ZIEHL & JONES LLP
           Wilmington, Delaware

                                           */s/ Bradford J. Sandler*
                                           Bradford J. Sandler (Bar No. 4142)
                                           Beth Levine (New York Bar No. 2572246)
                                           (admitted *pro hac vice*)
                                           Colin R. Robinson (DE Bar No. 5524)
                                           Peter J. Keane (DE Bar No. 5503)
                                           919 North Market Street, 17th Floor
                                           P.O. Box 8705
                                           Wilmington, Delaware 19899
                                           Telephone: (302) 652-4100
                                           Facsimile: (302) 652-4400
                                           Email:  bsandler@pszjlaw.com
                                                 blevine@pszjlaw.com
                                                 crobinson@pszjlaw.com
                                                 pkeane@pszjlaw.com

                                           Counsel to Alfred T. Giuliano, Chapter 7
                                           Trustee to Art Van Furniture, LLC, *et al.*

DOCS_LA:344272.10 05233/003